People v. William H. Farnsworth, No. 517-0185 Counsel, you are ready, you may proceed. I have the privilege of entering my 40th year of practicing law. I tried to figure out last night how many times I have argued at the appellate level. I think this is 22. I have had the good fortune of being in the 7th Circuit, the 8th Circuit, 5th District mostly, a couple of times in the 4th District, and I even had the privilege of going to the Supreme Court one time. Every time I have argued, it has always been the advancement of a legal principle. When I went to the Supreme Court, it was always the definition of a word, of the word rescission. The word was rescission, and the Supreme Court ruled that it has a prospective effect. Contrary to what you all wrote. We learned a new word yesterday, now we will learn something today. Well rescission is not that new, but the point that I am making is that it is always an advancement of a theory. Advancement of some position that is going to advocate for your claim. In this situation, in my opinion, it is not. This is, I am not advancing anything. I am just simply maybe advocating or arguing for clarification. I mean, the court has ruled, and the court in this situation has previously said to the Circuit Court, it is either I say what I mean, and I mean what I say. Justice Welch, Honorable Justice Welch, held in this prior case that the original sentencing hearing, the trial court, had considered improper aggravating factors. He further held that he did not give appropriate weight to mitigation. He also found that the Supreme Court of South Florida was instructive. The court said that the sentence of 12 years that originally was given was a great variance with the spirit and purpose of the law. The sentence was insufficiently supported by proper statutory factors and was excessive based on the particular circumstances of this case. That is what was held. We went back for the re-sentencing, and the state acknowledged that there is no other circumstances. That the situation that existed in the original sentencing was exactly the same. That there was no aggravating factors to be advanced by the state. That was their position. You've seen the brief. The court went on then, and what I termed as a chastisement, but maybe not, but the court went on to say, look, I felt that I was correct as court. And I felt that it was 12 years, or I wouldn't have given him 12 years. And I would give him 12 years again, but I feel that that would be throwing it back at the appellate court, so I'm not going to do that. I'm going to give him 10. Well, I don't, either this court intended, I mean this court said what it said, fastly ordered, and in my opinion, the trial judge just didn't get it. He just didn't understand. And the reason for that is, if you look at the Supreme Court case for Selvar, Council 4 of the state says, well, it cites Tharn, and it says you can't use comparative sentencing, and that's, he's correct. Tharn did stand that you cannot use comparative sentencing. However, if you read, and it was very, very articulate, well-reasoned dissent, and from Tharn's completely split decision, the majority must have went back because in the Tharn decision, it says, after it goes in and says, the legislature didn't intend for comparative sentencing, you can't use a comparative sentence, and each case has to go on its own merits. But it says, it specifically says that, however, trial court and a reviewing court can look at an individual case and follow the reasoning. Well, in Selvar, the reasoning, we're not arguing, even though it's a similar situation, and even though the facts, I believe in Tharn's work are better. What I'm saying is, in Selvar, if you look at that, first of all, they said you cannot use the death as an aggravating factor. Okay, well, the state's conceded that you can't. So if you take that out, Judge Gross, in his original sentencing, says, I'm not using deterrence. Deterrence is the only aggravating factor, and that's a statutory aggravating factor. I do disagree with that, because this is a non-deterrence crime. But the case law in every district is pretty clear that in a second-degree or a voluntary manslaughter situation, which was our old law, you can use deterrence. So that is the only aggravating factor. But Judge Gross, in his original, and it's quoted in Judge Walsh's order, he says, I'm not using deterrence. I am not giving that any consideration. I'm giving the consideration that he obstructed, that a gun was used, and a person was dead. And it resulted in a death. But counsel, that was in his original order, was it not? That was. Did he not look at deterrence after re-sentencing as an aggravating factor? He looked both. But how in one hearing can you say, I mean, what has changed? Nothing has changed. In fact, the only thing that has changed, actually there is a change. When we went back to the second hearing, the state allowed the stipulation as to the defendant's health as it deteriorated in prison. So if you look into statutory mitigating factors, there actually was an additional mitigating factor aside from the seven that was in the first hearing. So now we have an additional mitigating factor. There are no aggravating factors. The state has said that not once, but twice. And it's right in front of the court and says we have no aggravating factors. Okay? Then look at Salvero. Look at what the Supreme Court tells you in Salvero. It's not applying the facts. Well, it says the Supreme Court erred in imposing the sentence in excess of the minimum statutory period of imprisonment based on the aggravating factor of the victim's death. So here we have no aggravation. So you have a scheme. You have probation to 20 years. You bring that in front of the court. It's a second-degree murder. There are particular circumstances where there was a trust case that was killed. If you look at these facts and you apply it to South Carolina, you apply it to Florida, you apply it to the state of Mississippi. You apply it to all the states that have state of jurisdiction. He's not even charged. But we don't have that here. So he's charged. We have a stipulation that I argued unsuccessfully. I argued the original stipulation didn't amount to second degree. The court found different. But you start. If there's no aggravation, why don't you start at the minimum? How do you keep going there and start in the middle? The Illinois Constitution says that when you decide a citizen, it has to be decided in the framework of restoring an individual back to productive society. In Salvador, you had a 35-year-old man discharged dishonorably from the military, but no prior criminal record, no prior anything. And so there was no statutory aggravating factors except for deterrence and the death. You have the same situation here, but better. Bill Farnsworth was 67 years old and led a good life, had a 22-year-old DUI and a 33-year-old DUI. That was it. That was his only criminal record. This court ruled you can't use that. So the three factors that the original court said, the death, which he gave the most weight to, and the drinking and the firearm, you've already held that you can't use those. And here's the reviewing court. Under Pico v. Coulter, you have to follow your own mandate, your own prior order. And in your own prior order, you did articulate that the trial court looked at the seven mitigating factors. And now you have an eighth one, which is the health of the defendant. You have a defendant here that basically is pristine. How do you deviate from the minimum? Yes, you can say, well, but it's the death. Well, I'm sorry, but the death is in the statute. Okay. All right. Thank you, counsel. Sure. Good afternoon, Your Honors. May it please the Court? Yes, counsel. I am Patrick Daly. I'm here on behalf of the state. So one part of the argument, as I hear it, is an acknowledgment that we do not do cross-comparison analysis in determining whether a sentence is excessive or not. And then the other part of the argument appears to be doing exactly that. And it sort of, I think, accentuates the danger of applying factors in aggravation and mitigation, you know, And I think what the firm court was driving at when it rejected the cross-comparison mode is to say, really, sentencing in all cases is sui generis. Every case sort of stands on its own facts. Every case has to be considered both in light of the circumstances of the defendant. And I think what we have here is something that's not being accentuated enough, perhaps, are the facts of the case itself, the severity of the crime and what happened. Every case is different. And, of course, that's why we have a sentencing range. That gives the court the power to assess not only things that relate to, you know, what we describe in the factors of aggravation and mitigation, but the case itself. Now, I don't have any quarrel with counsel's formulation, if you will, of what the factors in aggravation and mitigation are here. On remand, the court seemed to retreat a little bit by saying, well, I didn't find as many factors in mitigation as I did, you know, the first time around. But I think when you really look at it, I think the principal factors in mitigation remained there. But the defendant's not likely to repeat this. He doesn't have a prior criminal history. The court was skeptical about the argument in mitigation about whether it would cause financial hardship. So it didn't really find in defendant's favor in that regard. It did find in favor of, as a factor in aggravation, that there was a need for deterrence. But I think what was interesting here is when it went back on remand, the court also said, look, and I should have said, at least I sort of blushed when I read that argument. I read the court's statements. It was sort of admonishing as well. But I think that what the court was really trying to get at was what maybe it felt, what the appellate court didn't understand, was that it didn't intend to, although it certainly did by its verbiage, it didn't intend to necessarily elevate the mere fact of the victim's death to a factor in aggravation, which was, of course, error, as Saldivar points out, as the court pointed out. But that rather was, I believe, the court's description was the mechanics and mechanism and violence inflicted upon the victim, which if you look at Saldivar, actually is very much in accordance with that principle, that Saldivar says, well, okay, we can't consider the fact of the victim's death as a factor in aggravation, but we can consider the manner in which the death was caused a degree of harm that was inflicted upon the victim in the crime. And I think that's ultimately what the trial court here was trying to get at. The importance of that is this, okay. Number one, let's start with some basics. We're here at a new sentencing hearing. Now, this court could have, if it wanted to, simply imposed a minimum sentence the first time around. Now, this court has that power then, it has that power now, and may elect to do so nonetheless with what I say here today. But nonetheless, it was remanded back for a new sentencing hearing, and there, again, the court was granted its discretion to impose a sentence that it felt fit based upon all totality of the circumstances, both of being in light of the nature of the crime and other factors before the court. And therefore, this court's review is for an abuse of discretion, okay. And those discretionary decisions are accorded great deference by this court on review. The courts have also, the courts' review have also held, I think importantly here, that it's not just the factors but the seriousness of the offense, the offense itself. And one court says that it's the seriousness of the offense, and not mitigating evidence, that's the most important factor for a court in fashioning an appropriate sentence here. Now, I'm going to do for here a moment exactly what I said no one should do, and that's going to look at salivar and I'm going to look at this case. Because I want to dispute this notion once and for all that somehow salivar provides a framework, even by way of guidance, for the appropriateness of the sentence in this case. Salivar is a lot different. Not deadly force by the use of deadly force, okay. There, the self-defense claim was not going to work as a perfect self-defense claim because what it started as a mutual combat, if you will, between the victim who had made a homosexual advance to the defendant. And the defendant was essentially a struggle, a fight, if you will, mutual combat. Some along the lines of that happening, the defendant in the statement to the police acknowledged that he took a knife and had stabbed the victim twice into the heart. Now, let's look at the facts of this case. Let me just stop right there. And now you need consideration when you look at all the factors of mitigation and how they are different from this case in terms of the victim. The defendant in that case had supporting his mother, he was supporting his father, supporting a wife, he was supporting children. He had post-traumatic stress disorder, and there's a number of different things here. What you have here is a situation where the defendant had been, there had been a verbal altercation that had been ongoing between the victim and the defendant. The victim, I think, stupidly followed the defendant home to his house, probably carried out, they were both drunk. The victim, the defendant then, apparently in response to seeing the victim following him, goes into his house and rather than going in the house and closing the door, comes back out with a gun, a loaded shotgun, and then confronts the victim. Now, I can go on about what I think probably happened. But this is a second-degree murder case. The court found that there was adequate, sufficient mitigating evidence to reduce this from first- to second-degree murder based upon the perception that the, excuse me, the victim may have been reaching for a gun. However, what we do have here is definitely not a mutual combat situation. This is a verbal conduct. The defendant never saw him. His belief in a gun was just based upon the sort of, you know, ambiguous notion that he'd been to prison before and he's a violent guy, so maybe he has a gun. I mean, that appears to be what the notion was here. But nonetheless, he not even exited his vehicle. He had not exited his vehicle when he went inside the house to get the shotgun. Then he came back out, escalating the situation. There was never any contact, any combat, no imperfect self-defense here, which is simply the defendant blasting this guy in the shoulder and neck and chest area with a shotgun in a 12-inch range. Okay? So when the court assesses the facts in this case and assesses the seriousness of defense and assesses the gravity of the type of harm and the manner in which it was employed, and the court's, I think, formulation here below that this was, like, over-the-top unreasonable in this situation, is the court manifesting that which it is exactly allowed to do, which is to consider those circumstances as it relates to the commission of the offense, along those factors in mitigation and make that balancing test. The 10-year sentence ultimately imposed here was bounded below the 12-year cap that the state had agreed to as part of the parent quid pro quo to go to the stipulated bench trial here and amend the charge, but it's less than half the midpoint range for the offense itself. Is it a serious sentence? Certainly it is. Is it unreasonable or arbitrary or not in accordance with the seriousness of the offense? And the deterrence factor, I think, really is pretty simple, okay? You get into a verbal fight, people ought not be going in with their guns, whether they're waving them around or pointed or whatever they're going to do, because bad things happen. And guess what happened here? A really bad thing happened. Someone's life was taken. Counsel? Yes, sir. This argument that, so this court, you know, remanded the case before and then the trial court made its comments and, well, I don't really like what the trial, you know, the appellate court said that, you know, I'd still give them 12, but, you know, I'll make them happy and give them 10. I mean, did the trial court really follow the mandate or the remand of this court's previous ruling or was it just going through the motions? I think we followed the mandate of this court. I think that what it did is it did have a new sentencing hearing. It did articulate for the record the factors that it was considering it was required to do on the remand. It wasn't, there was no dictation from this court that it had to impose any particular sentence or range of sentence. I don't know if the reduction was simply a sock to this court to satisfy what it thought the court wanted or whether it could, but I don't know. The courts are not required to necessarily hair-split their sentencing decisions in that regard. I think that the court's discomfiture, if you will, related more to what it perceived as a misperception of its view of the case rather than, you know, rather than, you know, necessarily an argument about the appropriateness of the decision in light of the elements of the case. You know, judges are people and they can get a little put out too, I suppose, like everyone else. And, you know, I think that what happened here, though, I think if you sort of extract this concept of whatever the judge's emotive response was to this court's earlier decision, you're still nonetheless left with a situation where the court considered factors of aggravation, considered factors of mitigation, considered as salivar says you can do, the seriousness and the gravity of the offenses that's being committed and emphasized that this was an important consideration in its regard in imposing the sentence. So, if anything, if the court had come back and reimposed a 12-year sentence, although I would have dreaded coming before this court with that particular disposition, I think the problem is still we've made an argument to justify it, but the court still nonetheless defined, all right, assumed for the sake of argument that this idea crept into mind, this thought process that the mere fact of the victim's death was a sentencing factor. Okay, I'm going to take that out. Here's what I have. Here's your 10-year sentence. So, I think that, one, this court looks at it. It's not an abuse of discretion because the court did exercise discretion. It was reasonable under the facts. Whatever the motives are for the court to do so or do what it did, nonetheless, objectively looked at, it was an appropriate sentence based upon everything that occurred in this case. And I'm out. Thank you, Your Honor. Thank you, Counsel. Counsel makes two important points I'm glad to hear finally brought up. First of all, he's correct. 315B, it's a Paragraph 4. This court could have said, look, if I sat on the orange carpet giving the four-year minimum, we wouldn't have been back here. You could have. You didn't. He's reading something into it. That's what we do as lawyers. I read into it that I argued this case on a watching day, which was November the 7th. On December the 14th, five weeks later, this court made a ruling. In my original argument, I asked this court, I stated to this court, I believe this was probational, there was because of salary, there was not one piece of aggravating factor put in there, and could you please let my client out by Christmas. So I read it with the quick decision of the court, two weeks prior to Christmas, maybe I got it wrong. Like I said, it was Justice Walsh's decision. Either he meant for the court to follow Salvador and let this guy out after four years, or he didn't. I believe based on the language that was used in the order, that's what this court intended. Why it didn't do a 315B4, I don't know. Maybe counsel's right. But nevertheless, this court did order this judge, under these particular circumstances, and we're going to let you re-sentence him. So let's say that's true. He gave him another bite at the apple. What happened? The state stipulated there are no different circumstances. We have nothing in aggravation. And I said, well will you stipulate this to his health record? Yes, we will. Will you stipulate that he's been a model prisoner since you've incarcerated him? Yes, we will. That's what was before the judge. And the judge opened up by saying, well, I was right in the first place, but I'm going to go through with this. And I think he just, he was, I'm sorry. And I like this judge. This is a good judge. But I just think he was a bit petulant on this day because of the ruling. And I still say that you go back to Salvador, and it's SARS. It's not, if you compare the facts to the finding, remember he was stabbed twice and shot? He made a good point about him shot. Yes, he was shot. It was all the way from his shoulder, all the way to the other shoulder. It was an 18-inch spread. He's correct. He was 12 inches in front of him. There was a point-blank shot from 12 inches, and it was not 12 gauges, as he said in his papers, it was a 20-gauge. But at 12 inches, that's going to only be the size of a nail. That's going to blow a hole right through you. The fact that that was the pattern, that was part of our, that it was a response. It was, oh, he jumped out of the car, and his legs were on the ground laying. So, if you look at the facts of this case, they're better than Salvador. It was a person who walked out, stood there, he'd been warned, don't come here, and the guy opened his door. We don't know how forcefully he opened it. The stipulation says he opened it with force. He had something in his hand, and he shot. This cried out for probation, given this particular circumstance. And I ask that you enter the room, and you utilize Supreme Court Rule 315B, Subparagraph 4, and send this back at a four-year minimum. It really makes no difference, because he served enough for seven years. By now, but that's what I ask that you do. Thank you, Counsel. Appreciate your arguments. So, we'll take this matter under advisement, and render a decision in due course.